UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Daniel Ayala,                                          Civil No. 15-1196 (MJD/FLN)

        Plaintiff,

        v.                                          **REPORT AND**
                                                                 **RECOMMENDATION**

CyberPower Systems (USA), Inc. et al.,

        Defendants.

_____

Dwight Rabuse for Plaintiff.
Amy Conway and Daniel Oberdorfer for Defendant CyberPower Systems (USA), Inc.
Michelle Christensen for Defendant Insperity PEO Services, L.P.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on Defendant

CyberPower Systems (USA), Inc.'s motion to dismiss (ECF No. 17) and Defendant Insperity PEO

Services, L.P.'s motion to dismiss (ECF No. 30). This matter was referred to the undersigned for

Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. Order, ECF No. 22;

Order, ECF No. 36. For the reasons set forth below, the Court recommends that CyberPower's

motion be **DENIED** and Insperity's motion be **GRANTED**.

## I. FINDINGS OF FACT

Plaintiff Daniel Ayala began working for CyberPower Systems, Inc. ("CyberPower") in July

2006. Am. Compl. ¶ 6, ECF No. 13. Ayala states that his original job title was "Vice President

Worldwide Channel," and his initial base salary was $180,000 per year. *Id.* ¶¶ 7, 10. When he began

working for CyberPower, Robert Lovett was the corporation's President and General Manager. *Id.*

¶ 6.

At the time Ayala began working for CyberPower, it had a "co-employer" relationship with

Defendant Insperity PEO Services, L.P. ("Insperity") pursuant to a Client Services Agreement. *Id.*

¶ 7. Accordingly, Ayala's initial Employment Agreement with CyberPower was prepared by Insperity.[1] *Id.* ¶ 7. This agreement explicitly stated that Ayala was an "at-will" employee and that his employment could be terminated at any time. *Id.*

On January 3, 2007, Ayala signed a "Handbook Acknowledgment," wherein he acknowledged that he received CyberPower's Employee Handbook. *Id.* ¶ 11; *see also* Christensen Aff. Ex. 3, ECF No. 33.[2] This document also reaffirmed Ayala's at-will employment status. *Id.* Furthermore, the Handbook Acknowledgment stated that "no manager, supervisor or representative of [CyberPower], other than the President or Vice President, [had] any authority to enter into any agreement guaranteeing employment for any specific period of time," and that any agreement

---

[1] At the time the contract was signed, Insperity conducted business under the name "Administaff." ECF No. 13 ¶ 7.

[2] In support of its motion to dismiss, Insperity submitted copies of various employment documents between Insperity and Ayala that are referenced in Ayala's Amended Complaint. *See generally* ECF No. 33. Generally, a motion to dismiss under Rule 12(b)(6) must be treated as a motion for summary judgment if "matters outside the pleadings are presented to and not excluded by the court." Fed. R. Civ. P. 12(d). Although "matters outside the pleading may not be considered in deciding a Rule 12 motion to dismiss, documents necessarily embraced by the complaint are not matters outside the pleading." *Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004). Documents embraced by the pleadings include those "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003). "[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 n.9 (8th Cir. 1997). Here, the documents submitted by Insperity are all documents referred to by Ayala in his Amended Complaint. Additionally, Ayala has not raised any question as to the authenticity of these documents. The Court therefore concludes that it may consider these documents in deciding Insperity's motion to dismiss without converting it to a motion for summary judgment.

guaranteeing employment for a specific period of time would have to be "in writing and signed by both parties." *Id.* Finally, the document stated that "an agreement made by the President or Vice President of CyberPower is not binding on [Insperity] unless it is agreed to in writing by the President or Vice President of [Insperity]." *Id.*

On May 1, 2007, Ayala claims that he received a letter from Robert Lovett dated May 2, 2007, raising his base salary to $200,000 per year. ECF No. 13 ¶ 12. The letter also set out a performance bonus formula and again reaffirmed Ayala's status as an "at-will" employee. *Id.* In conjunction with this letter, Ayala received and signed an Insperity "Employee Change of Status" document that reflected his pay increase. *Id.* ¶ 13; *see also* ECF No. 33, Ex. 4. Thereafter, in April 2009 and July 2010, Ayala received additional Employee Change of Status documents from Insperity which reflected pay increases to $234,000 and $270,000 per year respectively. ECF No. 13 ¶¶ 14–15; *see also* ECF No. 33, Ex. 4.

According to Ayala, Robert Lovett informed him on several occasions that he was receiving strong consideration to succeed Lovett as President and General Manager of CyberPower. ECF No. 13 ¶ 17. Around August 2012, however, Lovett told Ayala that Lovett's son, Brent Lovett, would instead succeed Lovett as General Manager of CyberPower. *Id.* ¶ 18. Upon hearing this decision, Ayala claims that he planned to leave CyberPower and obtain a senior position at a different company in the industry. *Id.* ¶ 19.

To forestall his departure, Robert Lovett informed Ayala in August 2012 that if he stayed at CyberPower in order to mentor Brent Lovett, he would receive a promotion to Executive Vice President and General Manager for Latin America as well as a significant increase in both his base salary and his bonus opportunities. *Id.* ¶ 20. This promotion and change in compensation would be

3

set out in a formal, written contract. *Id.* In reliance on these representations, Ayala elected to remain with CyberPower, purchase a condominium near the company, and forego any other employment opportunities. *Id.* ¶¶ 21, 23.

Following these conversations, CyberPower increased Ayala's annual base salary to $400,000 as the parties had discussed. *Id.* ¶ 22. Ayala received an Employee Change of Status document from Insperity on September 1, 2012, documenting this salary change. *Id.*; *see also* ECF No. 33, Ex. 4. Thereafter, Brent Lovett approached Ayala with a draft contract entitled "Compensation Agreement," which purported to outline Ayala's new position and compensation structure. ECF No. 13, Ex. A. The Compensation Agreement stated that Ayala would receive a base salary of $400,000 per year as well as "0.35% basis points in sales over an established sales quota of $36 million per year." *Id.* It additionally stated that the agreement "will remain in place until sales reach $150 million USD on a calendar year for all territories and VAR team assigned accounts." *Id.* Finally, under a section titled "Employment terms," the Compensation Agreement stated:

> The above-mentioned agreement outlines the new salary and bonus structure to remain in place until $150 million USD is reached. It is not a multiyear commitment or employment contract for either party.

*Id.*

Prior to signing the Compensation Agreement, Ayala claims to have had conversations with Robert and Brent Lovett, where they all agreed that the company could meet the $150 million sales goal within ten to twelve years, at which time Ayala would be reaching retirement age. ECF No. 13 ¶ 25. The Compensation Agreement was signed and made effective as of November 23, 2012. *Id.* ¶ 26. According to Ayala, he believed and understood that this agreement changed his employment with CyberPower from "at-will" to a position that would continue until sales levels reached $150

million. *Id.* ¶ 30.

Approximately two years later, Brent Lovett approached Ayala in November 2014 with a proposal to replace Ayala's existing Compensation Agreement with a new employment contract. *Id.* ¶ 36. Under the terms of the proposed contract, Ayala would receive a different job title, his base compensation would be reduced, and he would receive a less attractive bonus structure. *Id.* ¶ 37; *see also id.* Ex. B. The proposed contract also stated that Ayala's employment status would be "at-will." ECF No. 13 ¶ 37. The reason for this new contract, according to CyberPower, was because the company believed Ayala needed to be assigned a different role at the company with a corresponding compensation plan. Mem. in Supp. of Mot. to Dismiss 3–4, ECF No. 19. Upon reviewing the proposed contract, Ayala informed CyberPower that its terms were not acceptable. ECF No. 13 ¶ 38. CyberPower therefore terminated Ayala's employment for "unsatisfactory job performance," effective February 4, 2015. *Id.* ¶¶ 39, 42.

Ayala now brings suit against both CyberPower and Insperity, alleging claims arising out of his termination. *See generally* ECF No. 13. According to Ayala, the Compensation Agreement changed his employment status from "at-will" to employment for a specific period of time; namely, until annual sales reached $150 million. *Id.* ¶ 32. Therefore, Ayala claims in Count I of the Amended Complaint that CyberPower and Insperity breached his employment contract when it terminated his employment prior to annual sales reaching $150 million. *Id.* ¶¶ 44–47 (Count I). Second, and in the alternative to Count I, Ayala claims that CyberPower fraudulently misrepresented facts that he relied on to his detriment. *Id.* ¶¶ 48–56 (Count II). Finally, Ayala alleges that because he was terminated in violation of his employment contract, he is owed unpaid wages from CyberPower and Insperity pursuant to Minnesota Statutes section 181.13. *Id.* ¶¶ 57–61 (Count III).

CyberPower now moves to dismiss the Amended Complaint. ECF No. 17. CyberPower argues that (1) it did not breach the contract or fail to pay Ayala any wages because Ayala was an at-will employee; and (2) any alleged misrepresentations were subsumed by the contract itself. ECF No. 19 at 1–2. Insperity has also moved to dismiss the Amended Complaint, arguing that (1) Insperity was not a party to the contract Ayala claims was breached; and (2) Ayala was an at-will employee. Mem. in Supp. of Mot. to Dismiss 1–2, ECF No. 32.

## II. STANDARD OF REVIEW

In analyzing the adequacy of a complaint under Rule 12(b)(6), the Court must construe the complaint liberally and afford the plaintiff all reasonable inferences to be drawn from those facts. *See Turner v. Holbrook*, 278 F.3d 754, 757 (8th Cir. 2002). For the purpose of a motion to dismiss, facts in the complaint are assumed to be true. *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 738 (8th Cir. 2002). Nevertheless, dismissal under Rule 12(b)(6) serves to eliminate actions that are fatally flawed in their legal premises and designed to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity. *See Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989).

To avoid dismissal, a complaint must allege facts sufficient to state a claim as a matter of law and may not merely state legal conclusions. *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir. 1998). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A pleading must contain enough facts to state a claim for relief that is "plausible on its face," and a claim has facial plausibility only when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 570; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility standard

is not akin to a "probability requirement," but it calls for more than a sheer possibility that a defendant has acted unlawfully. *Iqbal*, 556 U.S. at 678.

### III. LEGAL ANALYSIS

**A.      CyberPower's Motion to Dismiss (ECF No. 17)**

**1.      Breach of Contract**

To establish a claim for breach of contract under Minnesota law, a plaintiff must allege "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011).

The parties do not dispute that Ayala's employment was at-will when he began working for CyberPower in 2006. Neither do the parties dispute that the 2012 Compensation Agreement was a valid and enforceable contract. The parties' disagreement, however, surrounds what impact, if any, the Compensation Agreement had on Ayala's at-will employment status. Ayala claims that the agreement changed his employment status to that for a specific duration of time—namely, until annual sales hit $150 million. Conversely, CyberPower argues that the Compensation Agreement simply outlined Ayala's compensation structure; it did not, however, change Ayala's status as an at-will employee. Accordingly, the primary question before this Court is whether Ayala was an at-will employee at the time he was terminated by CyberPower. If Ayala's employment with CyberPower was at-will, Ayala's breach of contract claim fails as a matter of law. *See Nelson v. Productive Alternatives, Inc.*, 715 N.W.2d 452, 454 (Minn. 2006) (stating that an at-will employment relationship can be "terminated for any reason or for no reason at all").

"Under Minnesota law, absent a contrary agreement by the parties, employment is presumed

7

to be at-will, permitting an employer to dismiss an employee for any reason or for no reason at all." *Poff v. W. Nat. Mut. Ins. Co.*, 13 F.3d 1189, 1191 (8th Cir. 1994) (citing *Harris v. Mardan Bus. Sys., Inc.*, 421 N.W.2d 350, 354 (Minn. Ct. App. 1988)). "To rebut the presumption of at-will employment and establish that the employer could only terminate the relationship for cause, an employee must show that the employer 'clearly intended to create such a contract.'" *Newland v. Connexus Energy*, No. A10-820, 2011 WL 206161, at *3 (Minn. Ct. App. Jan. 25, 2011) (quoting *Gunderson v. Alliance of Computer Prof'ls*, 628 N.W.2d 173, 181 (Minn. Ct. App. 2001)). It is, however, "permissible for the parties to modify an at-will employment relationship so as to create a specific duration of employment or conditions for termination." *Lyman v. Ricsons, Inc.*, No. CX-99-1329, 2000 WL 54040, at *2 (Minn. Ct. App. Jan. 25, 2000) (citing *Audette v. N.E. St. Bank of Minneapolis*, 436 N.W.2d 125, 126 (Minn. Ct. App. 1989)). Typically, an employee must establish "clear and unequivocal language by the employer evidencing an intent to provide job security." *Gunderson*, 628 N.W.2d at 182. "General statements about job security, company policy, or an employer's desire to retain an employee indefinitely are insufficient to overcome the presumption that employment is at will." *Id.* However, "[i]n ascertaining the nature of the employment relationship, courts must consider, among other things, the written and oral negotiations of the parties and the particular circumstances at issue." *Id.*

Additionally, the parol evidence rule under Minnesota law "prohibits the admission of extrinsic evidence of prior or contemporaneous oral agreements, or prior written agreements, to explain the meaning of a contract when the parties have reduced their agreement to an unambiguous integrated writing." *Alpha Real Estate Co. v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 312 (Minn. 2003). Accordingly, "when parties reduce their agreement to writing, parol evidence is

ordinarily inadmissible to vary, contradict, or alter the written agreement." *Id.* (citing *Hruska v.*

*Chandler Assocs.*, 372 N.W.2d 709, 713 (Minn. 1985)).

The Court's first task, therefore, is to determine if the plain language of the Compensation

Agreement changed Ayala's employment from at-will to employment for a specific duration of time.

The Compensation Agreement states, in its entirety:

> To:      Bob Lovett
> From:   Dan Ayala
> cc:       Brent Lovett
> Re:      Compensation Agreement
>
> With this memorandum the parties of Dan Ayala, Bob Lovett and Brent Lovett agree
> to the following compensation plan for Dan Ayala:
> 1. Employer: CyberPower Systems, Inc.
> 2. Employee Position: EVP Americas & General Manager LATAM
> 3. Base Salary: $400,000.00 (four hundred thousand USD) per year
> 4. Additional compensation plan: Mr. Ayala will receive 0.35% basis
>    points in sales over an established sales quota of $36 million per year.
>    a. The additional compensation portion will be paid on a
>       calendar quarterly basis
>    b. The calendar quarterly quota is $9 million USD ($36 million
>       USD per year)
>    c. Sales over quota are based on the quarterly "VAR NET
>       SALES" report which is represented by gross sales to
>       customers assigned to the VAR team minus product returns
>       and quarterly quota
>    d. The "VAR NET SALES REPORT" includes all USA
>       assigned accounts plus the Canadian and Latin-American
>       territories (the Americas territory)
>
> 5. Additional compensation example:
>    Quarterly sales minus product returns      $15,000,000.00
>    Sales quota                                $ 9,000,000.00
>    Difference                                 $ 6,000,000.00
>
>    Gross pay calculation (6,000,000.00 x 0.35%)   $ 21,000.00
>
> 6. Terms and conditions:
>    a. The current plan will remain in place until sales reach $150
>       million USD on a calendar year for all territories and VAR

9

             team assigned accounts

     b.    With the above formula Mr. Ayala would receive a total of $799 thousand USD based on a fixed portion of $400 thousand USD and $399 thousand USD in additional compensation upon reaching $150 million USD in sales

     c.    The new bonus structure will take effect as of Q4-2012 and payable on Q1-2013

    7.    Employment Terms: The above-mentioned agreement outlines the new salary and bonus structure to remain in place until $150 million USD is reached. It is not a multiyear commitment or employment contract for either party.

ECF No. 13, Ex. A.

In support of its argument that this contract did not alter Ayala's status as an at-will employee, CyberPower cites to the language contained in the very last sentence of the contract: "[The agreement] is not a multiyear commitment or employment contract for either party." ECF No. 19 at 9. CyberPower claims that the Compensation Agreement was simply that—an agreement setting forth how Ayala would be compensated. *Id.* It was not, however, an employment contract as it did not specify that Ayala's employment ceased to be at-will, outline conditions by which Ayala could resign, or provide any other employment terms separate from Ayala's compensation structure. *Id.* at 10. Because the Compensation Agreement did not clearly and unequivocally state that Ayala would no longer be an at-will employee, CyberPower argues that Ayala's employment with CyberPower remained at-will, and therefore CyberPower could not have breached the contract when it terminated Ayala's employment. *Id.* at 10–11.

In response, Ayala directs this Court to two separate clauses in the Compensation Agreement. ECF No. 29 at 14. The first states that "[t]he current plan will remain in place until sales reach $150 million USD on a calendar year for all territories and VAR team assigned accounts." ECF No. 13, Ex. A ¶ 6(a). The second states, "The above-mentioned agreement outlines the new

salary and bonus structure to remain in place until $150 million USD is reached." *Id.* ¶ 7. According to Ayala, "[i]t is impossible . . . for the compensation package to remain in place if the employment relationship does not, and thus there is no plausible construction of the Contract other than it made Ayala become an employee for a specified term." *Id.* at 16. Ayala therefore argues that the contract is "an agreement to employ Ayala at specified compensation levels until a target is reached." *Id.* at 18.

After a review of the written agreement between Ayala and CyberPower, the Court concludes that the contract's plain language is ambiguous as to whether the Compensation Agreement changed Ayala's employment status from at-will to that for a specified duration. First, as the parties admitted at the hearing, the contract was drafted by two non-lawyers (Robert Lovett and Ayala). Second, it is clear from the contract that it significantly altered Ayala's compensation structure. Indeed, the majority of the document sets forth a compensation structure based on the company's sales in a specified region over a certain time frame. Third, Ayala received a new title under the terms of the contract: EVP Americas & General Manager LATAM.

Most significant to the Court, however, is Paragraph 7 under the heading "Employment terms." As stated above, this section states:

> The above-mentioned agreement outlines the new salary and bonus structure to remain in place until $150 million USD is reached. It is not a multiyear commitment or employment contract for either party.

ECF No. 13, Ex. A. The Court finds that the poor drafting of these last two sentences leads to the possibility of multiple interpretations. For instance, the clause stating the agreement was not a "multiyear commitment" or "employment contract" could be interpreted, as CyberPower argues, to mean that the agreement was strictly related to Ayala's compensation and did not change his

employment status as an at-will employee. On the other hand, one could also interpret these clauses to mean that Ayala's employment with CyberPower was not a commitment for a specified term of years, but simply employment until he reached annual sales of $150 million. It was not a "multiyear commitment" because it was unknown whether that sales figure would be reached in ten years or in ten months. The ambiguity of the last sentence is only enhanced when read in conjunction with the remainder of the contract. It seems mutually inconsistent to say on one hand that Ayala will have a salary structure in place until sales reach $150 million, while at the same time state that Ayala is not entitled to this salary if CyberPower decides to terminate his employment. Due to the ambiguity caused by Paragraph 7 of the contract, the Court may therefore look to parol evidence to assist it with interpreting the meaning of the contractual language. *See Alpha Real Estate Co.*, 664 N.W.2d at 312 ("[W]here a written agreement is ambiguous or incomplete, evidence of oral agreements tending to establish the intent of the parties is inadmissible."); *see also Gunderson v. Alliance of Computer Prof'ls, Inc.*, 628 N.W.2d 173, 182 (Minn. Ct. App. 2001) ("In ascertaining the nature of the employment relationship, courts must consider, among other things, the written and oral negotiations of the parties and the particular circumstances at issue."). Specifically, the Court looks to the parties' prior dealings and negotiations to assist in interpreting the contract in question.

As stated above, the facts alleged in the complaint are assumed true when deciding a motion to dismiss. *In re Navaree Corp. Sec. Litig.*, 299 F.3d at 738. Ayala alleges that in order to forestall his departure after Brent Lovett was named General Manager, Robert Lovett offered Ayala a promotion and increase in compensation. ECF No. 13, ¶ 20. Ayala was thereafter provided with a new contract, which stated that it would remain in effect until such time as annual sales reached $150 million. *Id.* ¶ 25. According to Ayala, he had conversations with Robert and Brent Lovett

where they agreed such sales levels could be reached within an estimated 10 to 12 years, at which time Ayala would be reaching retirement age. *Id.* Based on these representations and the earlier discussions Ayala had with the Lovetts, Ayala understood that he would hold the position of Executive Vice President and General Manager for Latin America until such time as sales reached the $150 million mark. *Id.*

In addition, prior to the negotiations over the contract at issue in this case, Ayala had received numerous promotions and pay increases throughout his employment with CyberPower. On at least one occasion, Ayala received a promotion that was accompanied by a letter from Robert Lovett. *See id.* ¶ 12. This letter raised his base salary to $200,000 per year, set out a "Performance Bonus" formula, and explicitly stated that Ayala's employment remained at-will. *Id.* Similarly, the contract at issue raised Ayala's base salary and also set out a bonus structure. However, unlike Ayala's prior dealings with CyberPower, the contract did not state Ayala's employment remained at-will; it instead set out a specific length of time for which the contract would remain in place.

Based on the parties' negotiations and the fact that the contract at issue departed from the parties' prior dealings by not reaffirming Ayala's status as an at-will employee, the Court concludes that Ayala has sufficiently alleged a claim for breach of contract against CyberPower that is plausible on its face. Issues of material fact must be explored during discovery in order to determine whether the parties actually intended to change the at-will status of Ayala's employment with CyberPower. The Court acknowledges that after discovery, it may indeed be the case that Ayala remained an at-will employee with CyberPower after the Compensation Agreement became effective. At this point, however, the Court cannot definitively determine by the pleadings and the ambiguous terms of the Compensation Agreement whether Ayala was an at-will employee or if his

13

contract guaranteed him a position for a set duration of time. Accordingly, CyberPower's motion to dismiss Ayala's breach of contract claim must be denied.

### 2.      Fraudulent/Negligent Misrepresentation

In the alternative to his breach of contract claim, Ayala alleges that CyberPower made fraudulent misrepresentations that he relied on to his detriment. ECF No. 29 at 21. CyberPower seeks dismissal of this claim, arguing that it is inadequately pled and the claim is belied by the contract at issue. ECF No. 19 at 19–24.

In order to state a claim for fraudulent misrepresentation, a plaintiff must allege: (1) a false representation of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce the plaintiff to act in reliance thereon; (4) that the representation caused the plaintiff to act in reliance thereon; and (5) that the plaintiff suffered pecuniary damages as a result of the reliance. *See Salvate v. Automotive Restyling Concepts, Inc.*, No. 13-2898, 2014 WL 6901788, at *4 (D. Minn. Dec. 4, 2014) (citing *Valspar Refinish, Inc. v. Gaylord's Inc.*, 764 N.W.2d 359, 368 (Minn. 2009)). Additionally, Rule 9(b) of the Federal Rules of Civil Procedure states, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." A pleading which alleges fraud or mistake must identify "who, what, where, when and how." *Bank of Montreal v. Avalon Capital Grp., Inc.*, 743 F. Supp. 2d 1021, 1028 (D. Minn. 2010) (citing *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 550 (8th Cir. 1997)). "The purpose of Rule 9(b) is to provide the defendant with notice of and a meaningful opportunity to respond specifically to charges of fraudulent conduct by apprising the defendant of the claims against it and the facts upon which the claims are based." *In re Hardieplank Fiber Cement Siding Litig.*, No. 12-md-2359, 2013

WL 3717743, at *6 (D. Minn. July 15, 2013) (citing *Commercial Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639, 644 (8th Cir. 1995)).

CyberPower argues that Ayala's Amended Complaint does not allege the necessary elements of a fraud claim. ECF No. 19 at 22–24. According to CyberPower, "For promises regarding future acts to constitute fraud, 'there must be affirmative evidence that, when the maker made the promise, he or she had no intention of keeping it.'" *Id.* at 22 (quoting *Dial Tech., LLC v. Bright House Networks, LLC*, No. 13-2995, 2014 WL 4163124, at *5–6 (D. Minn. Aug. 21, 2014)). According to CyberPower, all of the representations set forth in the Amended Complaint concerned future acts (i.e., that Ayala would receive a promotion and new compensation if he agreed to stay at the company and mentor Brent Lovett). CyberPower therefore argues that because "Plaintiff has not alleged that Robert Lovett had no intention of following through on any such representations when he made them," the Amended Complaint must be dismissed. ECF No. 19 at 22. The Court disagrees.

In the Amended Complaint, Ayala alleges that in order to keep him at the company, Robert Lovett told Ayala that he would receive a promotion and a significant increase in base compensation. ECF No. 13, ¶ 20. Thereafter, Ayala claims to have had conversations with both Robert and Brent Lovett regarding the duration of this agreement, and both individuals expressed that they believed it would take 10 to 12 years to reach the levels outlined in the contract. *Id.* ¶ 25. Furthermore, Ayala states in Count II that (1) the material and false representations made by Robert Lovett to Ayala included that Ayala's employment with CyberPower would no longer be at-will and would instead be for a specified term, namely, until an identified sales level was reached; and (2) the representations when made were knowingly false, or made with and in disregard of their truth or falsity. *Id.* ¶¶ 50, 52. The Court concludes that these claims, taken as a whole, sufficiently allege

that CyberPower made material representations to Ayala that it had no intention of keeping.

CyberPower additionally argues that the Amended Complaint does not indicate how Ayala's reliance on Robert Lovett's alleged misrepresentations caused him any damages. ECF No. 19 at 23. Specifically, CyberPower argues that although Ayala claims he forewent various job opportunities in reliance on CyberPower's alleged misrepresentations, Ayala does not state any *specific* jobs that were available to him. *See* ECF No. 19 at 23 (citing *Ming'ate v. Bank of Am., N.A.*, No. 11-1787, 2011 WL 4590431 (D. Minn. Sept. 30, 2011)). Apart from the lost employment opportunities, however, Ayala additionally alleges that "[i]n reliance upon the Representations, Ayala purchased a condominium in Edina, Minnesota to have a residence in proximity to CyberPower company headquarters and better support the Company." ECF No. 13, ¶ 23. Therefore, even assuming without deciding that Ayala's claims of alternative employment are too speculative, the Court concludes that Ayala's condominium purchase is a specific assertion of damages suffered in reliance on CyberPower's alleged misrepresentations and is therefore sufficient to survive a motion to dismiss.

Finally, CyberPower argues that the Amended Complaint fails to state a claim for fraud because "the alleged misrepresentations are all subsumed by the Compensation Agreement itself." ECF No. 19 at 19–20. In other words, CyberPower argues that Ayala could not rely on the alleged misrepresentations made by Lovett because the Compensation Agreement directly contradicted any misunderstanding that Ayala had regarding his employment status. *Id.* at 20–21 (citing *Salvate*, 2014 WL 6901788, at *4 (holding that the plaintiff could not state a claim for fraud because the plaintiff could not reasonably rely on a promise that was contradicted by the parties' written agreement)). As discussed above, however, the Court concludes that the Compensation Agreement is ambiguous as to whether Ayala's employment would remain at-will or change to employment for a specific

duration of time. Accordingly, it cannot be said, as a matter of law, that the contract at issue "subsumed" the alleged misrepresentations made by CyberPower.

Based on the foregoing, the Court concludes that Ayala has adequately pled sufficient facts to support his claim of fraudulent misrepresentation in order to survive a motion to dismiss. CyberPower's motion must therefore be denied.

### 3.    Violation of Minn. Stat. § 181.13

Finally, CyberPower argues that Ayala's claim for unpaid wages under Minnesota Statutes section 181.13 must be dismissed because Ayala did not have a contractual right to the payment he seeks. ECF No. 19 at 25. CyberPower argues that because Ayala's employment was terminable at will, he has no right to any wages accruing after the date he was terminated. *Id.* at 25–26. However, considering that a question of fact still remains as to whether Ayala was improperly terminated prior to the end of his employment contract, the Court finds that this claim may survive CyberPower's motion to dismiss. The Eighth Circuit has stated that section 181.13 only applies "if an employer owes an employee unpaid wages or commissions under the employment contract." *Karlen v. Jones Lang LaSalle Ams.*, 766 F.3d 863, 867 (8th Cir. 2014). If it is later determined, after discovery, that Ayala had a contract with CyberPower for a specified term of employment, and CyberPower fired him prior to that term's expiration, Ayala will likely be entitled to additional compensation under the employment agreement. Accordingly, CyberPower's motion to dismiss Count III must be denied.

### B.    Insperity's Motion to Dismiss (ECF No. 30)

### 1.    Breach of Contract

In addition to filing a breach of contract claim against CyberPower, Ayala has also alleged that Insperity, "as co-employer, was bound by and has breached" the contract at issue in this case.

ECF No. 13 ¶ 46. Insperity now moves to dismiss that claim, arguing that it was not a party to the Compensation Agreement between Ayala and CyberPower. Mem. In Supp. of Mot. to Dismiss 8–12, ECF No. 32. The Court agrees with Insperity.

As previously discussed, this dispute revolves around the interpretation of the 2012 Compensation Agreement between Ayala and CyberPower. Insperity, however, was not a party to that contract. *See* ECF No. 13, Ex. 1. Indeed, Insperity's name does not appear anywhere within the document. *Id.* The only contract between Ayala and Insperity is Ayala's original employment contract that he signed in 2006. This agreement explicitly stated:

> 2.    AT-WILL EMPLOYMENT. Employee agrees that Employee's employment by and compensation from [Insperity] can be terminated, with or without cause, at any time, at the option of either [Insperity] or Employee. Employee understands that no on-site supervisor or [Insperity] representative, other than the President or a Vice President of [Insperity], has authority to enter into an agreement for employment with [Insperity] for any specific period of time, or to make any agreement contrary to the foregoing. Any such agreement must be in writing.

ECF No. 33, Ex. 1, ¶ 2. Furthermore, on January 3, 2007, Ayala signed a "Handbook Acknowledgment" form, which explicitly stated, "I also understand that an agreement made by the President or Vice President of CyberPower is not binding on [Insperity] unless it is agreed to in writing by the President or Vice President of [Insperity]." *Id.* Ex. 3.

As discussed above, Minnesota law presumes that employment is at-will absent a contrary agreement by the parties. *Poff*, 13 F.3d at 1191. To rebut this presumption, the employee must present objective evidence that the employer clearly intended to create a contract for a specified period of time. *See Gunderson*, 628 N.W.2d at 181–82 ("Typically, an employee must establish clear and unequivocal language by the employer evidencing an intent to provide job security."). Although Ayala claims that Insperity's motion to dismiss should be denied in order to explore any liability

18

Insperity may have as CyberPower's co-employer, it is clear to this Court that Ayala's employment with Insperity was at-will. Even assuming Ayala's assertion that the Compensation Agreement changed his employment with CyberPower to one for a specific duration of time, such agreement could not be binding on Insperity unless it was agreed to in writing by Insperity's President or Vice President. *See* ECF No. 33, Exs. 1 and 3. However, neither Insperity's President nor its Vice President signed the Compensation agreement. Accordingly, Insperity could not breach the agreement because no such contract existed between Insperity and Ayala.

Because the only contract governing the employment between Ayala and Insperity explicitly states that Ayala's employment was at-will, Insperity did not breach any contract with Ayala by terminating his employment. Ayala's breach of contract claim against Insperity, therefore, fails as a matter of law and must be dismissed.

### 2.    Violation of Minn. Stat. § 181.13

Because Insperity was lawfully permitted to terminate Ayala's employment and therefore did not breach its employment contract with Ayala, Ayala's claim under Minnesota Statutes section 181.13 must also be dismissed. *See Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 837 (Minn. 2012) ("To recover under [section 181.13] the employee must establish an independent, substantive legal right, separate and distinct from section 181.13 to the particular wage claimed.").

### IV. RECOMMENDATION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    CyberPower's motion to dismiss (ECF No. 17) be **DENIED**;

2.    Insperity's motion to dismiss (ECF No. 30) be **GRANTED** and Plaintiff's claims against Insperity be **DISMISSED WITH PREJUDICE**.

DATED: September 8, 2015                              _s/Franklin L. Noel_
                                                     FRANKLIN L. NOEL
                                                     United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **September 23, 2015**, written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **September 23, 2015,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.