UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 15-1196(DSD/KMM)

Daniel Ayala,

      Plaintiff,

v.                                               **ORDER**

CyberPower Systems (USA), Inc.,

      Defendant.

      Dwight G. Rabuse, Esq. and DeWitt Mackall Crounse & Moore, S.C., 1400 AT&T Tower, 901 Marquette Avenue, Minneapolis, MN 55402, counsel for plaintiff.

      Amy B. Conway, Esq., Daniel Oberdorfer, Esq. and Stinson Leonard Street LLP, 150 South Fifth Street, Suite 2300, Minneapolis, MN 55402, counsel for defendant.

This matter is before the court upon the motion for summary judgment by defendant Cyber Power Systems (USA), Inc. Based on a review of the file, record, and proceedings herein, the court grants the motion.

**BACKGROUND**

This dispute arises out of CyberPower's termination of plaintiff Daniel Ayala's employment on February 4, 2015. CyberPower hired Ayala in July 2006 as Vice President Worldwide Channel. Rabuse Aff. Ex. V, at 26. Ayala was responsible for value-added resellers (VAR) sales. R. Lovett Dep. at 27:12-23. At the time, Robert Lovett was President and Chair of CyberPower, and his son Brent Lovett was the company's operations manager. Id. at

21:6-13, 26:11-12. Ayala reported directly to Robert Lovett. Id. at 28:2-3. Ayala resided in Illinois and commuted to CyberPower's offices in Minnesota every other week and in the interim traveled elsewhere to visit customers. Ayala Dep. at 82:13-18.

On July 10, 2006, Ayala signed an agreement acknowledging that he was an at-will employee. Rabuse Aff. Ex. V, at 24-25. He also acknowledged that any changes to his at-will status "must be in writing." Id. at 24. In January 2007, Ayala signed another acknowledgment stating that "no manager, supervisor or representative of the Company, other than the President or Vice President, has any authority to enter into any agreement guaranteeing employment for any specific period of time" and that "any such agreement, if made, will not be enforceable unless it is in writing and signed by both parties." Id. at 22.

Between 2006 and 2012, Ayala performed well and VAR sales grew exponentially. R. Lovett Dep. at 30:23-31:11. CyberPower promoted Ayala and increased his compensation several times during that period. Id. at 30:12-22; see Rabuse Aff. Ex. V, at 13, 14, 16, 18. On at least two such occasions, CyberPower reiterated Ayala's at-will status: "This agreement does not create a vested right to any term of employment or otherwise change the fact that you remain 'employed at will.'" Rabuse Aff. Ex. V, at 15, 19.

In 2012, Robert Lovett decided to retire as president of CyberPower and began the process of finding a replacement. R. Lovett Dep. at 32:9-17. In April 2012, Ayala expressed his interest in the position and implied that he would leave CyberPower if he was not chosen to succeed Robert Lovett. Rabuse Aff. Ex. F. Ayala was not seriously considered for the position, however, because he "had a very difficult time with people." R. Lovett Dep. at 33:9-19. Robert Lovett specifically noted that Ayala could become "autocratic" thereby "creat[ing] dysfunctional communication tension, argumentative behavior, pushy monolog, and periodic lapses in judgment." Conway Aff. Ex. D, at 1. Robert Lovett ultimately chose Brett Lovett to replace him. R. Lovett Dep. at 33:20-25. Robert Lovett asked Ayala to stay at CyberPower to mentor his son and offered him a promotion and an increased compensation package. Ayala Dep. at 72:20-24. The parties agreed that Ayala would become the Executive Vice President Americas & General Manager LATAM (Latin America) and would receive an increase in annual base pay from $270,000 to $400,000. The salary increase appears to have been effective as of September 12, 2012, but the parties continued to negotiate other aspects of Ayala's compensation. See Rabuse Aff. Ex V, at 12. Ayala wanted to have an agreement in place that would ensure him a consistent commission formula going forward. Ayala Dep. at 79:19-80:11.

It appears that over the next few weeks Ayala and Robert Lovett spoke several times about Ayala's compensation. See id. at 81:4-84:22.  On October 22, 2012, Ayala sent Robert Lovett an email entitled "Comp Memo," which attached a proposed "compensation agreement" setting forth a calculation for determining Ayala's compensation above his base salary of $400,000.  Conway Aff. Ex. F. It is undisputed that Ayala drafted the document.  The proposed agreement states that the "plan will remain in place until sales reach $150 million USD on a calendar year for all territories and VAR team assigned accounts." Id. at 2.  It did not explicitly address Ayala's at-will status.  See id.

On October 28, Ayala sent Robert Lovett a follow-up email attaching his notes recalling the parties' negotiations and a copy of the proposed agreement.  Id. Ex. G.  The notes set forth the parties' specific negotiations as to financial terms but do not mention any change to Ayala's at-will status.  See id. at 3-4. Robert Lovett responded later that day stating that he had "issues signing such a long term employment contract, this will need to be run past our outside accounting firm and legal assistance."[1] Id. Ex. H.  The next morning, according to Robert Lovett, he told Ayala that the agreement was for compensation purposes only.  R. Lovett Dep. at 21:11-22.  Ayala testified that Robert Lovett told him to

---

[1] It is unclear whether counsel for CyberPower ever reviewed the agreement before it was executed.

"make sure that this is not interpreted as a multiyear agreement." Ayala Dep. at 90:16-18. Ayala then modified the agreement and sent the new version to Robert Lovett with the following notation:

> Please see attached. I modified paragraphs 6 and 7. Please feel free to modify as you see fit. The agreement is for compensation purposes and by no means a multiyear contract.

Conway Aff. Ex. I. Paragraph 7 of the compensation agreement reads:

> Employment terms. The above-mentioned agreement outlines the new salary and bonus structure to remain in place until $150 million USD is reached. It is not a multiyear commitment or employment contract for either party.

Id. at 3.[2]

In January 2013, Ayala sent an email to both Lovetts asking them to sign the agreement even though "[f]or all practical purposes" it was already in place. Id. Ex. J, at 1. Ayala said that he wanted to "ensure that the sales comp. plan" would remain in place until CyberPower achieved "$150 million in sales." Id. Although the date is unclear, the Lovetts ultimately signed the agreement. Id. Ex. E.

In May 2013, the parties signed a relocation expense agreement under which CyberPower agreed to finance a portion of Ayala's purchase of a condominium in Minneapolis. Id. Ex. K. CyberPower committed to pay Ayala $100,000 over a three-year period ending on

---

[2] CyberPower estimates that it will reach $150 million in sales in 2019 or 2020. B. Lovett Dep. at 70:22-72:8.

June 1, 2015. Id. The parties expressly contemplated that Ayala could be terminated from CyberPower before he received the full amount:

> Should you be terminated for any reason prior to receiving the full amount ($100k), you will receive the corresponding balance on your date of termination.

Id.

In late 2014, Brett Lovett, who was now president of CyberPower, became concerned about Ayala's fitness for his position following an incident during a meeting with CyberPower's parent company and reports of other troubling incidents by CyberPower employees and customers. B. Lovett Dep. at 47:11-48:7, 86:16-93:22. He was also concerned about Ayala's admittedly lagging sales. Id. at 47:15-19; Ayala Dep. at 200:16-19. CyberPower decided to offer Ayala a different sales position - General Manager for Latin America. B. Lovett Dep. at 121:7-25; Rabuse Aff. Ex. R; Am. Compl. Ex. B.

Ayala was willing to consider the new position until he received a draft revised compensation agreement that would have reduced his salary and bonus structure. See Am. Compl. Ex. B ¶ 2. The proposed agreement also expressly stated that Ayala's employment "is and remains at-will." Id. ¶ 4. Ayala acknowledged that CyberPower could change his title and responsibilities, but he disagreed that it could alter the compensation agreement or terminate him before sales reached $150 million. See Rabuse Aff.

6

Ex. N, at 1. Ayala then drafted a new agreement that increased his salary and bonus structure, required CyberPower to buy out the compensation agreement for $950,000, and set a five-year term of employment terminable for cause only. Id. Ex. M ¶¶ 1, 3, 4, 5.

CyberPower rejected Ayala's proposal, denying that (1) it had a multiyear employment contract with him, and (2) the compensation agreement was inviolable until CyberPower reached $150 million in sales. Id. Ex. S, at 1. Unable to reach agreement, CyberPower terminated Ayala's employment effective February 4, 2015. CyberPower explained to Ayala that it terminated him as Executive Vice President Americas & General Manager LATAM "due to unsatisfactory job performance" and that it terminated his employment because they were unable to agree to terms of the new position. Rabuse Aff. Ex. U. It is undisputed that CyberPower paid Ayala everything owed to him as of February 4, 2015, including the last payment under the relocation expense agreement. Ayala Dep. at 258:24-259:5.

On March 6, 2015, Ayala commenced this suit against CyberPower.[3] In his amended complaint, filed on April 16, 2015, Ayala alleges breach of contract, fraudulent/negligent misrepresentation, and violation of Minn. Stat. § 181.13.

---

[3] Ayala also named Insperity PEO Services, L.P., which provided administrative services to CyberPower, as a defendant. See Am. Compl. ¶¶ 44-47, 57-61. Ayala later voluntarily dismissed Insperity from the case. ECF Nos. 46, 49.

7

CyberPower now moves for summary judgment.[4]

**DISCUSSION**

**I.  Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. Id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. Id. at 255. The nonmoving party, however, may not rest on mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. Celotex, 477 U.S. at 324. A party asserting that a genuine dispute exists - or

---

[4] CyberPower moved to dismiss the amended complaint soon after it was filed. The court, based on the report and recommendation of the magistrate judge, denied the motion, concluding that the compensation agreement was ambiguous. See ECF Nos. 41, 49. Ayala argues that the court is bound by that ruling under the law of the case doctrine. The court disagrees and will review the matter de novo. See Lovett v. Gen. Motors Corp., 975 F.2d 518, 522 (8th Cir. 1992) (holding that the law of the case doctrine "applies only to issues decided by final judgments").

cannot exist - about a material fact must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, 477 U.S. at 322-23.

**II. Breach of Contract**

Ayala first alleges a claim of breach of contract, arguing that the compensation agreement altered his at-will status and prohibited CyberPower from terminating him or adjusting his compensation until it reached $150 million in sales. Under Minnesota law, "[a] claim of breach of contract requires proof of three elements: (1) formation of a contact, (2) the performance of conditions precedent by plaintiff, and (3) breach of the contract by the defendant." Thomas B. Olson & Assocs., P.A. v. Leffert, Jay & Polglaze, P.A., 756 N.W.2d 907, 918 (Minn. Ct. App. 2008). "The cardinal purpose of construing a contract is to give effect to the intention of the parties as expressed in the language they used in drafting the whole contract." Art Goebel, Inc. v. N. Suburban Agencies, Inc., 567 N.W.2d 511, 515 (Minn. 1997). Construction of an unambiguous contract is a legal question for the court, while construction of an ambiguous contract is a factual question for the jury. Denelsbeck v. Wells Fargo & Co., 666 N.W.2d 339, 346 (Minn. 2003). Whether a contract is ambiguous is a question of law for a

9

court to decide. Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp., 279 N.W.2d 349, 354 (Minn. 1979). A contract is ambiguous if "it is reasonably susceptible to more than one interpretation." Art Goebel, Inc., 567 N.W.2d at 515. "Where the parties express their intent in unambiguous words, those words are to be given their plain and ordinary meaning." Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc., 666 N.W.2d 320, 323 (Minn. 2003). A court determines whether a contract is ambiguous "based solely on the language of the contract." Maurice Sunderland Architecture, Inc. v. Simon, 5 F.3d 334, 337 (8th Cir. 1993).

**A.   The Compensation Plan is Unambiguous**

This case turns on whether the parties altered Ayala's at-will status when they entered into the compensation agreement. "The usual employer-employee relationship is terminable at the will of either" the employer or employee. Cederstrand v. Lutheran Bhd., 117 N.W.2d 213, 221 (Minn. 1992). To overcome the presumption of at-will employment, an employee "must present evidence [the employer] made oral or written statements with specific and definite provisions." Lindgren v. Harmon Glass Co., 489 N.W.2d 804, 810 (Minn. Ct. App. 1992). An employee's subjective beliefs about his employment status are irrelevant. Id.

Ayala admits that he was an at-will employee initially, but argues that the compensation agreement altered his status. Specifically, Ayala argues that the compensation agreement

unambiguously promises him employment at a certain compensation level regardless of his conduct or performance "until $150 million USD is reached." Conway Aff Ex. I, at 3. Ayala even contends that he was not free to resign until sales reached $150 million. Ayala Dep. at 137:5-9. CyberPower responds that a plain reading of the agreement leads to the contrary conclusion, namely that Ayala was guaranteed the compensation set forth in the agreement <u>if</u> he remained in the role of Executive Vice President Americas & General Manager LATAM and until sales reached $150 million. CyberPower further notes that the agreement's subsequent language clarifying that "[i]t is not a multiyear commitment or employment contract for either party" establishes that the parties intended that Ayala's at-will status would remain unchanged. Ayala replies that CyberPower's interpretation would be correct if commas were inserted before "or" and after "contract"[5] and that the failure to include them supports his interpretation of the clause. The court disagrees with Ayala's position and finds that CyberPower did not promise Ayala a certain level of compensation or guaranteed employment until sales reached $150 million.

First, a plain reading of the agreement undermines Ayala's assertion that the compensation agreement was not terminable for any reason by either party until sales reached $150 million. The

---

[5] "It is not a multiyear commitment[,] or employment contract[,] for either party."

11

agreement - which Ayala titled "compensation agreement" and repeatedly referred to as a "compensation plan" and "new salary and bonus structure" - does not prohibit his termination until the sales threshold is reached, nor does it guarantee the same amount of compensation if his responsibilities change.  Rather, the compensation agreement sets forth the basis for computing Ayala's compensation as "EVP Americas & General Manager LATAM" until sales reach $150 million.  Conway Aff. Ex. I, at 2 ¶¶ 2, 7.  The additional provision stating that the "agreement outlines the new salary and bonus structure and "is not a multiyear commitment or employment contract" - even without commas - evinces the parties' intent in this regard.  Id. ¶ 7.

Second, Ayala's interpretation of the agreement is unreasonable and would lead to an absurd result.  See Emp'rs Mut. Liab. Ins. Co. of Wis. v. Eagles Lodge of Hallock, Minn., 165 N.W.2d 554, 556 (Minn. 1969) ("[T]he terms of a contract must be read in the context of the entire contract, and the terms will not be so strictly construed as to lead to a harsh and absurd result.").  This absurdity is highlighted by Ayala's testimony that he believes CyberPower would have to buy him out of the compensation agreement even if he decided to stop working altogether before sales reached $150 million.  Ayala Dep. at 139:17-140:8.

Third, the agreement does not specifically and definitely alter Ayala's at-will employment. Lindgren, 489 N.W.2d at 810. To the contrary, the agreement states that it is not a "multiyear agreement or employment contract." Ayala's argument that the agreement is not a "multiyear commitment" because it is based on an event rather than a set number of years is unpersuasive. As a practical matter, the only reasonable interpretation of the term "multiyear" is that it refers to an extended period of time; it does not evince the parties' intent to only prohibit a term of employment defined by a certain number of years. Indeed, under Ayala's interpretation, his employment could extend indefinitely if he could not - or chose not to - drive sales to $150 million.[6] Under Minnesota law, a contract of such indefinite term "is terminable by either party at will upon reasonable notice to the other." Benson Co-op. Creamery Ass'n v. First Dist. Ass'n, 151 N.W.2d 422, 426 (Minn. 1967). Further, it strains credulity to suggest that CyberPower would not agree to employ Ayala for a specific number of years but would agree to employ him indefinitely.

Finally, Ayala's argument that the compensation agreement promises him a salary and bonus after his termination as a "golden parachute" is unavailing. The cases on which he relies involve

---

[6] The fact that CyberPower estimates that sales may reach that level by 2019 or 2020 does not mean that they will.

employment contracts with post-termination compensation provisions. See Covinsky v. Hannah Marine Corp., 903 N.E.2d 422, 425 (Ill. App. Ct. 2009); Sealock v. Tex. Fed. Sav. & Loan Ass'n, 755 S.W.2d 69, 70-71 (Tex. 1988). The compensation agreement contains no such provision.

As a result, a plain reading of the compensation agreement warrants the entry of summary judgment on the breach-of-contract claim.

### B.  Even if Ambiguous, CyberPower Did Not Breach the Compensation Plan

CyberPower is entitled to summary judgment even if the compensation agreement could be deemed ambiguous. A contract is ambiguous when "the language used is reasonably susceptible to more than one meaning." Blattner v. Forster, 322 N.W.2d 319, 321 (Minn. 1982). "If the writing is ambiguous, a court must ascertain the intent of the parties and determine the meaning of the language by looking to the circumstances surrounding the making of the contract and to the parties' own subsequent interpretation of the agreement." Medtronic, Inc. v. Catalyst Research Corp., 518 F. Supp. 946, 951 (D. Minn. 1981). A court may also consider evidence of other agreements "tending to establish the intent of the parties." Gutierrez v. Red River Distrib., Inc., 523 N.W.2d 907, 908 (Minn. 1994) (quotation marks and citation omitted).

Here, the parties' negotiations and subsequent conduct contradict Ayala's interpretation of the agreement. First, in

negotiating the agreement, Robert Lovett told Ayala that he had issues signing a "long term employment contract" and to "make sure that this is not interpreted as a multiyear agreement." Conway Aff. Ex. H; Ayala Dep. at 90:16-18. When Ayala sent Robert Lovett a revised agreement, he confirmed that the "agreement is for compensation purposes and by no means a multiyear contract." Conway Aff. Ex. I. Any ambiguities in the resulting contractual language are construed against Ayala, who drafted the compensation agreement. See Hilligoss v. Cargill, Inc., 649 N.W.2d 142, 148 (Minn. 2002) ("[A]mbiguous contract terms must be construed against the drafter[.]").

Second, and even more compelling, the relocation agreement expressly contemplates that CyberPower could terminate Ayala before June 2015 – the date the last payment was due and long before either party anticipated sales reaching $150 million. See Conway Aff. Ex. K. As a result, even if the compensation agreement is ambiguous, CyberPower is entitled to summary judgment.

### III. Fraudulent/Negligent Misrepresentation

In the alternative to his contract claim, Ayala alleges that CyberPower defrauded him by promising to maintain his employment at the level of compensation set forth in the compensation agreement until sales reached $150 million. In order to maintain a fraud claim, Ayala must prove that:

15

> (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffered pecuniary damage as a result of the reliance.

Stumm v. BAC Home Loans Servicing, L.P., 914 F. Supp. 2d 1009, 1013 (D. Minn. 2012) (citing Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C., 736 N.W.2d 313, 318 (Minn. 2007)). Ayala submits no evidence in support of his claim and instead relies on allegations raised in the amended complaint. See Pl.'s Mem. at 33-36. A party opposing a properly supported motion for summary judgment, however, "may not rest upon mere allegations ..., but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. Ayala has failed to meet this burden. As a result, summary judgment is warranted on the fraud claim.

**IV. Unpaid Wages**

Ayala asserts a claim under Minn. Stat. § 181.13, which requires employers to pay wages promptly on termination. He concedes that he was paid everything owed to him on the date of his termination, including the remainder of the relocation amount, but argues that he should continue to be paid the amount set forth in the compensation agreement until CyberPower's sales reach $150 million. As set forth above, the record does not support a finding that the parties agreed to such an arrangement. As a result,

16

CyberPower does not owe Ayala any additional wages and is entitled to summary judgment on this claim as well.  See <u>Karlen v. Jones Lang LaSalle Americas, Inc.</u>, 766 F.3d 863, 867 (8th Cir. 2014) ("Section 181.13 only applies if an employer owes an employee unpaid wages or commissions under the employment contract.").

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that the motion for summary judgment [ECF No. 81] is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March 21, 2017

<u>s/David S. Doty</u>
David S. Doty, Judge
United States District Court
